**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | No. 08 CR 511-2 |
| | ) | |
| **JAIME CHAVEZ** | ) | Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

On June 25, 2008, federal narcotics agents arrested Defendants Javier Ochoa and Jaime Chavez as they attempted to purchase several kilograms of cocaine from an undercover government source. After receiving his *Miranda* warnings, Defendant Chavez invoked his right to counsel and questioning ceased. Later that afternoon, however, before Chavez had spoken with an attorney, an agent with the United States Drug Enforcement Agency ("DEA") asked Chavez to consent to a search of his apartment, warning that the DEA would obtain a search warrant if Chavez refused to consent. Chavez ultimately consented, and the resulting search uncovered ammunition, a money counter, and proof of residence, all of which the government intends to introduce at trial. Chavez has moved to suppress this evidence on the ground that his consent was not provided voluntarily. The court disagrees, and for the reasons that follow, the motion is denied.

**FACTS**[1]

On June 23, 2008, two confidential sources ("CSs") met with Chavez and Ochoa at Chavez's apartment. Chavez and Ochoa stated that they had enough money to purchase nine kilograms of cocaine at $19,750 per kilogram, and that they would collect money from others to purchase even more. Defendants also discussed prior drug deals in which they had been involved, as well as plans relating to future deals. They agreed to meet one of the CSs two days later in a parking lot in Summit, Illinois to complete the transaction. Ochoa did most of the talking at this

---

[1] The following facts are drawn from the testimony of Special Agent Donald Wood at the hearing on April 1, 2009, as well as from the affidavit of Task Force Officer Michael Bedalow of the DEA, dated June 25, 2008 and attached to an application for a search warrant for a residence in Aurora.

meeting.

On the morning of June 25, just hours before the drug sale was to take place, Chavez was observed driving back and forth between his apartment and Ochoa's residence. At one point, Chavez exited his apartment carrying a duffel bag that he placed in a Chevrolet Avalanche before getting in another vehicle driven by Ochoa, though apparently registered to Chavez. (A subsequent search of the bag uncovered no incriminating evidence.) Ochoa drove to the location where the parties had agreed to meet, and the CS asked to see the money. Chavez watched as Ochoa pried off a side panel of the car, revealing approximately $150,000 to $200,000 in United States currency. Shortly after seeing the money, the CS contacted waiting DEA agents, and Chavez and Ochoa were arrested at approximately 12:45 p.m. Along with the U.S. currency, a gun was also recovered from their vehicle. Federal agents recorded the entire meeting between Defendants and the CS.

At approximately 1:30 p.m., a Spanish-speaking DEA agent read Chavez his *Miranda* rights, and Chavez immediately invoked his right to counsel. Agents then ceased questioning Chavez, and transported him from the Summit, Illinois police department to a federal lock-up facility in Chicago. About three hours later, Special Agent Wood, along with a Spanish-speaking DEA agent who acted mainly as an interpreter, sought Chavez's consent to conduct a search of his residence. Wood made this request without any information beyond what is described above, and before Chavez had consulted with an attorney. Initially, Wood asked Chavez whether he had any drugs or other contraband at his residence, and Chavez said no, but that there was a small amount of money. Wood then asked whether Chavez would allow federal agents to search his residence in order to confirm that there was nothing illegal there. Chavez responded by asking what would happen if he did not consent, and Wood told him that the officers would then obtain a search warrant. Chavez then asked how the agents would enter his residence if they obtained a warrant; Wood told him that if they did not have a key, they would have to force entry. Chavez expressed concern about having the door broken down because his wife lived in the apartment, and at

2

approximately 4:47 p.m. he signed a Spanish-language consent form authorizing the search of his residence and the Chevrolet Avalanche, where Chavez had left a set of keys for his apartment.[2] There is no evidence that Chavez refused consent at any point; that he was told that he was required to sign the consent form; or that he was physically threatened.

Ochoa refused to consent to a search of his residence, and at some point on June 25—it is unclear whether this was before or after Chavez signed the consent form—Magistrate Judge Arlander Keys signed a search warrant for Ochoa's residence. The affidavit attached to the application for the warrant recounted much of the above evidence. In addition, the affidavit stated that agents had received contradictory explanations from individuals found at Ochoa's residence as to whether Ochoa lived there; that several individuals entered and exited that residence in the hours following Ochoa's arrest; and that a search of another of Ochoa's residences uncovered approximately twenty pounds of marijuana and a gun.

Chavez has moved to suppress the evidence obtained in the search of his apartment on the ground that his consent was not voluntarily given.

## DISCUSSION

To protect a suspect's right to be free from self-incrimination, law enforcement officials must inform a suspect held in custody of several of his constitutional rights prior to an interrogation, including the right to remain silent and the right to the assistance of counsel. *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). When the suspect requests an attorney, interrogation of the suspect must cease until an attorney is provided. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). Asking a suspect for consent to conduct a search, however, does not constitute an interrogation because providing consent is not in itself a self-incriminating statement. *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996). Accordingly, when police obtain consent to conduct a search even after

---

[2] The government is not offering any evidence uncovered from a search of the car.

the suspect has invoked his right to counsel, the evidence produced by that search is admissible. *Id.*; *see also United States v. McClellan*, 165 F.3d 535, 544-45 (7th Cir. 1999).

Defendant Chavez nevertheless maintains that his consent to search was not valid. While the Fourth Amendment generally requires government agents to obtain a warrant prior to conducting a search, *see Katz v. United States*, 389 U.S. 347, 356-57 (1967), the warrant requirement does not apply if the individual whose possessions are to be searched provides voluntary consent. *See, e.g.*, *United States v. Sandoval-Vasquez*, 435 F.3d 739, 744 (7th Cir. 2006). Chavez argues that his consent was not voluntarily given because he consented only after Agent Wood impermissibly resumed interrogation despite Chavez's invocation of his right to counsel. Chavez further contends that his consent was coerced by the DEA's threat to obtain a search warrant and break down the door of his apartment if Chavez did not sign the consent form.

Whether consent was given voluntarily is a question of fact based upon the totality of the circumstances. *See id.* The government bears the burden of proving that the suspect voluntarily consented by a preponderance of the evidence. *Id.*; *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007). Factors relevant to determining whether consent was voluntary include: (1) defendant's age and intelligence; (2) whether he was told of his constitutional rights; (3) the length of his detention prior to his consent; (4) whether consent was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether the suspect was in police custody at the time of consent. *Johnson*, 495 F.3d at 542 (citing *Sandoval-Vasquez*, 435 F.3d at 744). A cursory review of these factors strongly suggests that Chavez's consent was voluntary. Although Chavez was in police custody at the time he provided consent, none of the other factors favor a finding of involuntariness. *See United States v. Watson*, 423 U.S. 411, 424 (1976) ("custody alone" does not "demonstrate a coerced . . . consent to search"). Chavez appears to be of at least average intelligence, was informed of his rights, and was not subjected to any sort of physical coercion. While he was detained for several hour prior to giving his consent to the search, Chavez was left

4

alone for most of that time period and was approached only once about providing consent; the entire encounter with Agent Wood in which Wood sought consent did not last more than a few minutes. *See United States v. Renken*, 474 F.3d 984, 988 (7th Cir. 2007) (interrogation of twelve minutes not so long as to render consent involuntary). Based on these general considerations, then, Chavez's consent appears to have been given voluntarily.

The above list of factors is not exclusive, however, and courts have found other factual circumstances to be relevant to the voluntariness determination. In this case, those other circumstances include Chavez's contention that Agent Wood's questions about contraband prior to seeking consent renders the subsequent consent involuntary. The fact that Wood engaged in questioning Chavez is not by itself dispositive; the Seventh Circuit has held that "the request for consent to search can be properly separated from whatever illegal interrogation that might have preceded it, thereby making the consent constitutionally valid." *McClellan*, 165 F.3d at 544 (citing *Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir. 1985)). Rather, "[i]t is only when the police coerce the defendant's consent to make a search during an interrogation that such consent will be considered as involuntary and thus unconstitutional." *McClellan*, 165 F.3d at 544 (citing *Shlater*, 85 F.3d at 1255). Agent Wood's interrogation of Chavez was not particularly intrusive: Wood asked Chavez whether he had contraband, and Chavez responded that he had cash only; Wood then asked for consent, warning Chavez that he would obtain a search warrant—and possibly break down the door—if Chavez withheld his consent. Whether Wood's questions about contraband after Chavez had requested an attorney constituted a violation of Chavez's rights is a question the court need not consider here, except to the extent it was coercive. *McClellan*, 165 F.3d at 544-45.

In arguing that Wood's conduct did create a coercive atmosphere, Chavez notes Wood's warning that without Chavez's consent, agents might need to break down the door of his apartment. The court concludes that this truthful explanation of the manner in which a search could be executed, without more, falls short of the standard required for coercion. In fact, these

5

circumstances are less troublesome than those in *United States v. Santiago*, where the defendant consented to a search based on a concern that any contraband found at his apartment might be imputed to his girlfriend and in response to an alleged threat from the police that they might take his children and place them into state custody. 428 F.3d 699, 705 (7th Cir. 2005). Santiago consented to the search in exchange for keeping his family "out of this," and the consent was held voluntary, notwithstanding the fact that it was motivated by concern for his family. *Id.*; *see also Davis v. Novy*, 433 F.3d 926, 930 (7th Cir. 2006) (defendant's consent to a search of his truck was voluntary even though he consented only after being told that his truck would be impounded). Chavez's concern that agents might kick down the door and frighten his wife is a less serious concern than Santiago's fear; the court observed that Santiago was "rightfully concern[ed]" that his girlfriend might be implicated in his drug dealings. *Santiago*, 428 F.3d at 705; *cf. United States v. Ivy*, 165 F.3d 397, 402-03 (6th Cir. 1998) (consent not voluntary when it was the product of ninety minutes of threats to arrest the suspect's girlfriend and take her baby away). The court concudes that Wood's assertion that federal agents armed with a search warrant might need to kick down the door did not coerce Chavez into consenting to the search.

Finally, the court considers Agent Wood's statement that he would obtain a search warrant if Chavez refused consent. A suspect's consent to a search is not voluntary when it is merely "acquiescence to a claim of lawful authority," *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968), and "[b]aseless threats to obtain a search warrant may render consent involuntary." *United States v. White*, 979 F.2d 539, 541 (7th Cir. 1992). To determine whether a "threat" to obtain a search warrant is baseless, the reviewing court is not, contrary to Chavez's assertions, required to determine whether probable cause actually existed at the time of the consent. Rather, in order to "know whether the statement was baseless or not," the court must determine "whether there was probable cause (*or a reasonable factual basis to believe there was probable cause*)." *United States v. Hicks*, 539 F.3d 566, 571 (7th Cir. 2008) (emphasis supplied). The court announced this

6

standard to avoid a situation where the officer seeking consent relies solely on the representations of another officer that probable cause is present, thus creating a "clean heart, empty head" loophole where the individual officer acts with a good faith belief that probable cause exists even where it does not. *Id.* at 572. Hicks holds that the officer seeking consent must have more than a good faith belief that he would obtain a search warrant; instead, he must have a reasonable factual basis to believe that probable exists—a standard more stringent than mere good faith, but less stringent than a determination that probable cause in fact existed. *See id.* So while the court has little trouble concluding that Agent Wood honestly believed that he could obtain a search warrant for Chavez's residence, the court must also determine whether a reasonable factual basis existed that would support Wood's honest belief.

The court concludes that such a reasonable factual basis existed. As recounted above, at the time he spoke to Chavez around 4:47 p.m. on June 25, Wood knew that Chavez and Ochoa had discussed their possession of substantial amounts of money to pay for a large amount of cocaine, that the two had met at Chavez's residence with the CS to discuss the drug purchase, and that Chavez was shuttling back and forth between his own residence and Ochoa's on the morning of the 25th. In addition, Chavez and Ochoa were seen entering Chavez's apartment together that morning, and Chavez was seen leaving his residence with a gym bag. This evidence amply establishes probable cause to believe Chavez was involved in a conspiracy to possess narcotics; less clear is whether the officers also had probable cause to believe evidence of the unlawful activity would be found at Chavez's apartment. Chavez's admission that cash would be found is insufficient for this purpose; as explained above, that statement is probably inadmissible and, in any event, the government does not rely upon it.

The issue before the court, however, is not whether it would have issued a warrant on these facts. Instead, the court must assess whether the evidence supported a *reasonable belief* on the part of Wood that he could obtain a search warrant. The court concludes this test is met. As the

Seventh Circuit recently noted, "participation in drug trafficking activities can create probable cause to search a participant's residence, even without direct evidence that drug-related activity is occurring there, because '[i]n the case of drug dealers, evidence is likely to be found where the dealers live.'" *United States v. Hoffman*, 519 F.3d 672, 676 (7th Cir. 2008) (quoting *United States v. Lamon*, 930 F.2d 1183, 1188 (7th Cir. 1991)). While Chavez correctly notes that *Hoffman* contained some distinguishing facts from the present case, the evidence Wood did possess could reasonably be considered to fall within *Hoffman*'s reach. Again, the *Hoffman* court observed that probable cause for a search of a drug dealer's residence may be warranted even without any evidence that drug-related activity has taken place at the residence. *Hoffman*, 519 F.3d at 676. Here, the government had evidence that some drug-related activity (namely, the June 23 meeting) had taken place at Chavez's apartment. Agents had also observed Chavez traveling back and forth from his home to that of his suspected co-conspirator on the morning of the planned transaction, and exiting at one point with a duffel bag that could have contained cash for the intended purchase. The court notes, further, that the DEA did obtain a search warrant that same night for one of Defendant Ochoa's residences with little more evidence connecting that residence to drug trafficking than existed for Chavez's residence. *See United States v. Sleet*, 54 F.3d 303, 307 (7th Cir. 1995) ("[I]n the ordinary case, a law enforcement officer 'cannot be expected to question' the magistrate's probable cause determination." (quoting *Illinois v. Krull*, 480 U.S. 340, 349 (1987))). Agent Wood's statement that he would obtain a search warrant was therefore grounded in a reasonable factual basis.

Considering the totality of circumstances, the court concludes that Chavez—who had been informed of his constitutional rights, was not subjected to physical coercion or intimidation, and

provided his consent shortly after being asked—provided voluntary consent for a search of his apartment.[3]

## **CONCLUSION**

For the reasons given above, Defendant's Motion to Suppress Evidence [57] is denied.

ENTER:

Dated: April 23, 2009

*(signature)*
_____
REBECCA R. PALLMEYER
United States District Judge

---

[3] Because the court concludes that Chavez voluntarily consented to the search of his apartment, the court has no need to consider the government's alternative argument that these circumstances fall within the inevitable discovery exception to the Exclusionary Rule. *See, e.g.*, *United States v. Blackwell*, 416 F.3d 631, 633 (7th Cir. 2005).